# EXHIBIT A
(Declaration of Laura LaRaia)

# UNITED STATE DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-01126-REB-STV

LENDER TOOLKIT, LLC

      Plaintiff,

v.

MLD MORTGAGE, INC.,

      Defendant.

## DECLARATION OF LAURA LARAIA

I, LAURA LaRAIA, hereby declare and state as follows:

1. My name is Laura LaRaia. I am over 18 years of age and am competent to testify to the matters stated herein.

2. The statements in this declaration are made based upon personal knowledge, and where I lacked personal knowledge, I have undertaken efforts to verify the information in my capacity as an authorized agent of Defendant MLD Mortgage, Inc. ("MLD") in the above-captioned case.

3. I am the Chief Legal and Chief Enterprise Risk Officer at MLD.

4. MLD is a New Jersey corporation with its principal place of business and headquarters located at 30B Vreeland Rd., Suite 200, Florham Park, New Jersey, 07932 ("New Jersey Office").

5. MLD is licensed to provide mortgage lending services in forty-seven (47) states.

6. MLD's financial, executive, and support operations are run out of its New Jersey Office.

7. MLD does not have any offices or physical infrastructure located in the State of Colorado, and MLD does not have any employees located in the State of Colorado.

8. On or around March 25, 2021, MLD and Lender Toolkit, LLC ("LTK") entered into an agreement (the "Agreement"). A true and accurate copy of the Agreement is attached to this Declaration as **Exhibit 1**.

9. The Agreement bears the signature of David Zilberman, Chief Financial Officer of MLD. Mr. Zilberman is a resident of the State of New Jersey, works out of MLD's New Jersey Office, and executed the Agreement within the State of New Jersey.

10. The products and services that LTK was to provide to MLD pursuant to the Agreement were to be implemented in MLD's nationwide business and were not to be limited exclusively to services offered within the State of Colorado.

11. Invoices pursuant to the Agreement were billed to MLD's New Jersey Office, and any payments made would have been authorized exclusively through MLD's New Jersey Office. Invoices dated after December 31, 2021 contained instructions to make payment to LTK at PO Box 712225, Salt Lake City, Utah 84121, and payments related to invoices prior to that date were submitted to LTK at PO Box 201, Bountiful, Utah 84010.

12. MLD's Colorado business volume between 2019 and the present accounts for approximately .081% of its national business volume. For comparison, MLD's New Jersey business volume accounted for approximately 26.6% of its national business volume, and California accounted for approximately 37% of its national business volume during the same time period.

13. Upon information and belief, MLD's performance under the Agreement, including facts associated with LTK's allegations of nonperformance, could or would exclusively be performed within the State of New Jersey.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. Section 1746.

Executed on this ___13th___ day of July 2023.

By: *Laura LaRaia*
Laura LaRaia

# EXHIBIT 1
To LaRaia Declaration
("The Agreement")

DocuSign Envelope ID: 2CE8D2A0-FCB9-4C0F-861C-C1570723F7DF



**TERMS OF SERVICE – AGREEMENT**

This Schedule and Terms of Service ("TOS", "Agreement") is between Customer ("Customer", "Lender") stated in the signatory section of the TOS and Lender Toolkit (the "Provider", "LTK"). Unless otherwise provided, the capitalized terms used in this contract and not otherwise defined shall have the meanings given to them in the Agreement.

## SET-UP

Provider will provide account and website setup and training to the Customer, in such amounts as Customer shall reasonably determine but not to exceed one month (1), on how to deploy, setup programs and tools. Provider will provide installation help via job aides, telephone, and/or web conference. Further, Provider shall, within a good faith period of Customer request, provide any troubleshooting and/or support necessary, at no cost to Customer, to repair or resolve any issues relating to the Programs and/or Services. Advisory services which are related to Customer issues will be billed at standard rates.

## GRANT OF LICENSE

Subject to the terms and conditions of this Agreement, Licensor grants to Customer during the Term of this Agreement the nontransferable, nonexclusive worldwide right to permit Users to (a) use the Service and software, including the Base Components thereof, (b) display and print Customer Data, and (c) use the SaaS Materials solely in connection with the Service and software, all solely for Customer's own internal business operations, provided such internal business operations shall not include commercial time-sharing, rental, outsourcing, service bureau or similar use. For purpose of this license grant, Customer shall include any outsourced or other third-party consultants or similar personnel supporting Customer as part of its typical business practices, acting under Customer's direction and for whom Customer is fully responsible hereunder. Customer acknowledges and agrees that the license granted, for the items listed in the Definitions herein, and that the rights granted to Customer in this Agreement are subject to all of the following agreements and restrictions: (i) Customer shall not license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose or otherwise commercially exploit or make the Service or the SaaS Materials available to any third party other than an authorized User; (ii) Customer shall not modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the Service, including without limitation the Vendor Software and or SaaS Materials that are provided as a part thereof, or access the Service or SaaS Materials in order to build a similar or competitive product or service; (iii) Customer shall not create Internet "links" to the Service or "frame" or "mirror" any part of the Service, including any content contained in the Service, on any other server or device; (iv) except as expressly stated herein, no part of the Service or SaaS Materials may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means, including but not limited to electronic, mechanical, photocopying, recording, or other means; (v) Customer agrees to make every reasonable effort to prevent unauthorized third parties from accessing the Service and Software; (vi) Customer acknowledges and agrees that Licensor or its Third Party Vendors shall own all right, title and interest in and to all intellectual property rights in the Service, Software and the SaaS Materials and any suggestions, enhancement requests, feedback, or recommendations provided by Customer or its Users relating to the Service or Software or the SaaS Materials, including all unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, know-how and other trade secret rights, and all other intellectual property rights, derivatives or improvements thereof; (vii) unauthorized use, resale or commercial exploitation of any part of the Service or Software or SaaS Materials in any way is expressly prohibited; (viii) Customer does not acquire any rights in the Service or Software or SaaS Materials, express or implied, other than those expressly granted in this Agreement and all rights not expressly granted to Customer are reserved by Licensor and Third Party Vendors; and (ix) this Agreement is not a sale and does not convey any rights of ownership in or related to the Service, Software, Vendor Software, Third Party Products, or SaaS Materials to Customer. Provider represents and warrants to Customer that Provider shall not violate or infringe upon any patent, copyright, trade secret, trademark, or other intellectual property of another person/entity in provider the services, programs, and/or tools to Customer.

## INTELLECTUAL PROPERTY RIGHTS.

**Rights in Property.** Customer acknowledges and agrees that the Service and any necessary software used in connection with the Service or installed Software contain proprietary and confidential information that is protected by applicable intellectual property and other laws. Customer further acknowledges and agrees that the content or information presented to the Customer through the Service or Software may be protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws. Except


where expressly provided otherwise by Licensor, nothing in the Service or Software, the SaaS Materials (Campaign documents), or the Agreement shall be construed to confer any license to any of Licensor's (or its third-party manufacturers, authors, developers, vendors, and service providers ("Third-Party Vendors"), intellectual property rights, whether by estoppel, implication, or otherwise.

## DISCLAIMER

Customer shall be solely responsible for the final testing of all programs and tools supplied by Provider hereunder, provided, however, that Provider shall assist and provide support to Customer in the event any programs and/or tools are not functioning to Customer's satisfaction. Provider shall have no responsibility whatsoever for any compliance issues relating to Customer's business for any programs or tools supplied by Provider. Notwithstanding the foregoing, in the event any programs or tools supplied by Provider violate any applicable laws, Provider shall indemnify and hold harms Customer pursuant to the Indemnity section below.

## INDEMNITY

Each party (the "Breaching Party") agrees to indemnify, defend, and hold the other party and the other party's Affiliates and their respective officers, directors, partners, members, employee's, counsel, accountants, financial advisers, consultants, and other advisers (each, an "Indemnified Person") harmless from and against any demand, claim, counterclaim, cross-claim, third-party claim, action, suit, litigation, investigation, legal proceeding (whether at law or in equity), petition, complaint, notice of violation, arbitration, or similar proceeding (whether civil, criminal, administrative, arbitral, or investigative) (a "Claim"), and any damages, judgment, loss, award, amount paid in settlement, deficiency, expense (including interest, court costs, reasonable fees of attorneys, accountants, and other experts, and other reasonable costs of litigation, arbitration, or similar proceedings, as applicable), obligation, commitment, assessment, cost, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto (a "Liability") incurred by an Indemnified Person as a result of, in connection with, or arising out of or relating to (i) any act or omission of the Breaching Party or the Breaching Party's Affiliates, including but not limited to any programs or tools infringing upon any patent, copyright, trade secret, trademark, or other intellectual property of another person/entity and (ii) any breach of any term, condition, covenant, agreement, representation, warranty, or obligation of the Breaching Party or the Breaching Party's Affiliates contained in this Agreement or in any other agreement, instrument, document, statement, certificate, or schedule furnished by or to the Breaching Party or the Breaching Party's Affiliates.  This Indemnity section shall survive termination of this Agreement.

The term "Affiliate" means: (a) with respect to any person who is a natural person, (i) each entity that such person controls and (ii) such person's spouse, siblings, and lineal and collateral ancestors and descendants by birth or adoption, as well as the siblings and lineal and collateral ancestors and descendants by birth or adoption of such person's spouse; and (b) with respect to any person that is an entity, (i) any person directly or indirectly controlling, controlled by, or under common control with such person; (ii) any person directly or indirectly owning or controlling five percent (5%) or more of the outstanding voting interests of such person; (iii) any employee, manager, officer, director, attorney, or agent of such person; and/or (iv) any employee, manager, officer, director, attorney, or agent of an Affiliate of such person.  For purposes of this definition, the term "control," "controlling," "controlled by," or "under common control with" shall mean the possession, directly or indirectly (through one or more intermediaries), of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

## LIMITATION OF LIABILITY

Provider SHALL NOT BE LIABLE FOR ANY LOST PROFITS NOR BE LIABLE FOR SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES arising out of or in connection with the use of the programs and tools provided hereunder.

## MEMBERSHIP FEES & CHARGES

DocuSign Envelope ID: 2CE8D2A0-FCB9-4C0F-861C-C1570723F7DF



# TERMS OF SERVICE – AGREEMENT

Provider will invoice Customer monthly in arrears per agreed the schedule below for licensing services. One time or upfront fees will be billed at the start of the contract. Payment terms are net 30 days from the date of invoice on all undisputed amounts.

| Product / Item | Fee / Rate | Comments / Terms |
|---|---|---|
| LTK Set Up & Integration **(MERS Automation)**<br>- Account and site setup<br>- Schedule orientation meeting<br>- Provide additional documentation, as necessary.<br>- Limited to 10 hours, or one (1) month | $2,000 | Services billed at contract start. |
| MERS Automation<br>- MERS Registration<br>- Sub servicer update<br>- Transfer of Servicing<br>- Transfer of Benefits<br>- Includes a queuing system to define delivery criteria.<br>- Includes an email notification if there is an error (e.g. inaccuracy in the loan file), the system will automatically send a notification to the administrator to fix the loan file so automation can complete. | $2.00 per funded loan<br>Minimum of 750 loans per month. | Billed at the end of each month |
| LTK Set Up & Integration **(FHA UFMIP Automation)**<br>- Account and site setup<br>- Schedule orientation meeting<br>- Provide additional documentation, as necessary.<br>- Limited to 10 hours, or one (1) month | $2,000 | Services billed at contract start |
| FHA UFMIP Automation<br>- Includes a queuing system to define delivery criteria<br>- Includes an email notification if there is an error (e.g. inaccuracy in the loan file), the system will automatically send a notification to the administrator to fix the loan file so automation can complete. | $250 per funded loan<br>Minimum of 1 loan per month. | FHA UFMIP offered at a flat rate ($250) as long as MERS automation solution is maintained. |
| **Pricing Summary** | | |
| **Implementation & Set Up Services**<br>MERS Automation Set Up Fee    $2,000<br>FHA UFMIP Automation Set Up Fee   $2,000<br><br>**Licensing**<br>MERS Automation *Billed monthly based on total funded loan count, with minimum of 750 loans per month.* | | |



# TERMS OF SERVICE – AGREEMENT

**Customer Acceptance.** Monthly payments will commence the earlier of the implementation of MERS Automation, or one (1) month from the execution of this Agreement. Provider will continue to support and implement the other products and services under the provisions of this Agreement.

**Late Payments.** Payments due to Provider under this Agreement shall, if not paid within thirty (30) days, bear simple interest at the highest rate permitted by law or one percent (1.0%) per month, whichever is lowest. Provider agrees, in addition to any other remedies provided in this Agreement or available at law or in equity, to pay all costs of collection of undisputed fees due hereunder, including without limitation, all court costs and reasonable attorney's fees.

**Disputed Amounts.** Customer must provide Provider written notice of any disputed charges on or before the date such amount would be due if undisputed ("Disputed Amounts"). In the event of any Disputed Amounts only the disputed portion of any invoice or other charges may be withheld from payment and the undisputed portion must be paid on or before it is due. The Parties will exercise reasonableness in disputing any Disputed Amounts. The Parties will work diligently and in good faith to reach a mutually acceptable resolution to any Disputed Amounts, provided, however, if the Parties have not reached such a resolution and Customer made the agreed upon payment per such resolution within sixty (60) days after the Disputed Amounts would have been due if not disputed, each party shall have all rights and remedies available to them in law and in equity.

**Funded Loan Reporting**. Provider will use the Closed Loan field in Encompass, [1997] to determine the amount of funded loans to be used for monthly billing. If more appropriate, and mutually agreed upon, Customer may indicate a different Encompass field that indicates the funding, e.g. Funding Milestone [MS.Date.Funding]. If funded loan statuses are not appropriate for determining monthly usage other terminology should be substituted i.e. Purchased Loans [2370], Completion [MS.Date.Completion], etc. A minimum of 750 units per month will be required.

## CANCELLATION

In the event that Provider cancels this Agreement under the provisions hereof Provider shall have no further obligation to Customer whatsoever.

Customer acknowledges that Provider's software, tools, or applications being used may require configuration, training, or dependencies to be removed or resolved prior to cancellation. If Customer does not resolve these dependencies, Provider will not be responsible for any issues that arise.  Provider may provide guidance on these areas under the provisions of the agreement.

## TERM

This Agreement shall commence as of the Effective Date and continue for a period of three (3) year ("Term"). This Agreement shall automatically renew for the same period.  A thirty (30) day convenience period following the end date of this Agreement is acceptable while a renewal is being contemplated. This Agreement may be extended in writing by Customer and accepted by Provider at Provider's discretion. Billing will continue during convenience period if not requested or extended prior to the anniversary date.

## TERMINATION

This Agreement may be terminated at any time if one of the following occur: (a) both parties agree to terminate the relationship, (b) one Party is unable to provide and deliver services to which they are responsible for and the other party elects to terminate, or (c) if one Party breaches its responsibilities under this Agreement or (d) if for any reason a Customer account becomes more than 60 days overdue in payments and has not worked out any extended payment terms with Provider, the Customer shall be in breach of the contract and Provider may terminate services immediately and final invoice for the value of all outstanding invoices plus the remaining value of the term of the contract and all penalties covered by but not limited to items covered under the Fees and Payment Section.

## TERMINATION FOR BREACH

Either Party may terminate this Agreement immediately for cause by giving notice to the other Party if the other Party materially breaches any of its obligations under this Agreement and such breach is not cured within thirty (60) days after the breaching Party receives written notice of such breach from the non-breaching Party.

DocuSign Envelope ID: 2CE8D2A0-FCB9-4C0F-861C-C1570723F7DF



**TERMS OF SERVICE – AGREEMENT**

## EFFECT OF TERMINATION
Upon expiration or earlier termination of this Agreement, the following shall occur: (a) all license rights granted hereunder shall immediately terminate (except that Customer may continue to use the licenses granted hereunder in order to support any paying customers or proposed customers during such period they are placed under contract to do so, the Parties shall continue to be bound by the terms and conditions of this Agreement with respect to the use of such licenses); Customer shall pay Provider all amounts owed or invoiced by Provider pursuant to the terms of this Agreement; and (d) the Recipient (defined below) shall either, at the Discloser's (defined below) option, return to the Discloser or destroy all Confidential Information (defined below) of the Discloser in the Recipient's possession or control and permanently erase all electronic copies of such Confidential Information promptly upon the written request of the Discloser and certify in a writing signed by an officer of the Recipient that it has fully complied with its obligations.

## LTK WILL BE RESPONSIBLE FOR:
- Customer set-up, training and on-going call support
- Enhancing and adapting the existing Provider products capabilities
- Enhancing and evolving their Encompass interface and API feed to Provider products.
- Providing general support and maintenance its products.

## SUPPORT
Provider shall use commercially reasonable efforts to correct any errors in the operation of the Services ("Defect") and will classify each Defect
Support to Customers, as applicable, during commercially acceptable hours, for all Provider Products.

Contact Details

Support Phone - 801.784.6514
Support Email - support@lendertoolkit.com

Billing Support – <u>billing@lendertoolkit.com</u>
Provider shall respond to and attempting to resolve reported Errors in the Provider Products by telephone, electronic mail, online submission, or delivery of Error Correction. Provider shall use its commercially reasonable efforts to correct Errors in the Provider Products, so long as Errors are repeatable by Provider, or providing a software patch or bypass around such Errors;

DocuSign Envelope ID: 2CE8D2A0-FCB9-4C0F-861C-C1570723F7DF



# TERMS OF SERVICE – AGREEMENT

*In witness whereof, the parties have executed these Terms of Service by their duly authorized representatives as of the Effective Date.*

| **Lender Toolkit, LLC** | **The Money Store** |
|---|---|
| By: *Brett Brumley* (DocuSigned by: 8FB1C77AB64E4DB...) <br> Name: Brett Brumley | By: *David Zilberman* (DocuSigned by: A33EC82F7E4F4A2...) <br> Name: David Zilberman |
| Title: CEO | Title: CFO |
| Date: 3/25/2021 | Date: 3/25/2021 |